Edward W. LENTZ, Plaintiff
and Appellant,

v.

Marguerite Linsert LENTZ,
Defendant and Appellee.

Civ. No. 10554.

Supreme Court of North Dakota.

June 28, 1984.

Schuster & Brothers, Fargo, for plaintiff and appellant; argued by James R. Brothers, Fargo.

Nelson, Kalash, Gronneberg & Molenaar, Grand Forks, for defendant and appellee; argued by Dwight F. Kalash, Grand Forks.

ERICKSTAD, Chief Justice.

Edward Lentz appeals from a judgment entered by the District Court of Grand Forks County on October 10, 1983, granting him a divorce from Marguerite Lentz on the ground of irreconcilable differences. Edward contends that the trial court clearly erred (1) by making an inequitable distribution of the parties' property, and (2) by ordering that Marguerite's share of Edward's Federal Civil Service retirement annuity be adjusted annually. We affirm the judgment in major part.

■ In distributing the property of parties to a divorce action the trial court's ultimate objective is to make an equitable distribution of the marital estate. What is equitable lies within the discretion of the trial court and depends upon the facts and circumstances in a particular case. *Graves v. Graves,* 340 N.W.2d 903, 906 (N.D.1983); *Nastrom v. Nastrom,* 284 N.W.2d 576, 580 (N.D.1979). The equitableness of the distribution is treated as a finding of fact and will not be set aside on appeal unless it is clearly erroneous. *Pankow v. Pankow,* 347 N.W.2d 566, 568 (N.D.1984).

Edward and Marguerite Lentz were married on November 22, 1961, at Anchorage, Alaska. Two children were born of the marriage: Kristina, born April 3, 1967, and Erika, born April 8, 1979. The dissolution of the marriage occurred when Edward was 55 and Marguerite 46 years of age.

At the time of trial Edward had recently been graduated from the University of North Dakota School of Law and was seeking employment. Marguerite resided with the children in Northfield, Massachusetts, working part time for Northfield Mount Hermon Schools earning $350 per month and also operating an inn, the Centennial House, purchased by the parties in 1981.

The trial court found that Edward draws approximately $1,450 per month as part of a retirement annuity resulting from his twenty-one years of service to the Federal government. The retirement annuity is subject to a cost of living adjustment provision. The court divided Edward's retirement annuity between the parties on the basis of a fixed percentage of monthly benefits Edward receives under the annuity. Pertinent findings concerning the distribution of the annuity read as follows:

> "The plaintiff's retirement, projecting the plaintiff's age to 76, (his life expectancy based on AmJur 2nd Desk Book Table Item 159), *without* adjustments is worth approximately $365,400.00....
>
> "The Court finds that the defendant traveled with the plaintiff and sacrificed her career and education. She has also been actively involved in raising the children of the parties. She was married to the plaintiff during approximately 16 of his 21 years. She has basically received all the parties' income for several years while the plaintiff lived on [student] loans he'll have to repay.

> "The Court will deduct one year from her entitlement as she has fixed up her residence [Centennial House], etc. from all the defendant's annuity. Thus, she shall be entitled to $15/21$ of one-half [35.7%] of his retirement income or $518.00 per month now and it shall be adjusted each October 1st. She states, 'She did not just sit on the couch and eat chocolates,' and the Court finds this to be true."

The court valued and divided the remainder of the marital estate as follows:

#### To Edward

| | | |
|---|---|---|
| Arlington, VA house | $120,000 | |
| Less: mortgage | 28,000 | $ 92,000 |
| Appliances | | 1,000 |
| Ford Courier | | 1,000 |
| Judgment: Sunset Memorial Gardens | | 9,000 |
| Personal property | | 4,730 |
| | | $109,730 [1] |

The trial court found that Edward's "assets in effect are to be reduced by his $15,000 [student] loan which must be repaid."

#### To Marguerite

| | |
|---|---|
| Centennial House | $115,000 |
| Personal property | 13,800 |
| Business property | 7,400 |
| Stocks and investments | 22,260 |
| Bank accounts | 5,890 |
| | $164,350 |

The trial court found that virtually all of the parties' property was acquired during the course of the marriage.

Marguerite was awarded custody of Kristina and Erika. Edward was ordered to pay Marguerite $400 per month in child support, reduced to $300 when Kristina reaches the age of eighteen or is otherwise emancipated. Edward is entitled to claim the children as exemptions for income tax purposes.

■ Edward contends that the trial court's distribution of the parties' property is inequitable and therefore clearly erroneous. He believes that an equitable distribution could be effectuated if this court were to grant him all right, title and interest in his retirement annuity.

*Williams v. Williams,* 302 N.W.2d 754, 757 (N.D.1981), quoted extensively by the trial court, is one of many of our cases which sets forth the approach the trial court is to take in its effort to arrive at an equitable distribution of marital property in a divorce action:

"There exist no set rules a trial court must follow in arriving at this distribution. For instance, *there is no require-*ment *that a property division in a divorce case be equal in order to be equitable. Hoge v. Hoge,* 281 N.W.2d 557 (N.D.1979).

"While no specific rules for the distribution of property exist, N.D.C.C. Section 14–05–24 provides certain guidelines for the trial court:

'14–05–24. *Permanent alimony— Division of property.*—When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects.'

"In light of this section this court has sanctioned awards based upon the guidelines enumerated in *Ruff v. Ruff,* 78 N.D. 775, 52 N.W.2d 107 (1952), and *Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966), commonly referred to as the '*Ruff-Fischer* Guidelines.' These guidelines allow a trial court to consider the respective ages of the parties to the marriage; their earning abilities; the duration of the marriage and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time; its value and its income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material. *Nastrom v. Nastrom,* [284 N.W.2d 576 (N.D.1979)]." [Emphasis added].

---

**1.** The values listed for property distributed to Edward total $107,730, rather than $109,730 as the trial court indicated. The court listed, in determining the net worth of the parties, a house in Absaraka, North Dakota, valued at $2000, but did not specifically list that property in dividing the marital estate. A review of the trial transcript reveals that the parties' claim to the property is predicated upon an oral agreement between Edward and his brother-in-law to the effect that Edward could have the house if he wanted it. It is clear to us that it was the trial court's intent to award the house to Edward.

The trial court must determine the net worth of the parties' assets before applying the *Ruff-Fischer* guidelines if sufficient evidence has been admitted to make such a determination. *Pankow v. Pankow, supra; Williams v. Williams, supra,* 302 N.W.2d at 759.

■ Edward argues that the trial court did not explain which particular *Ruff-Fischer* guidelines were or were not considered by the court in distributing the marital estate. We have said that a trial court need not make an express finding as to each of the factors enumerated; although appellate review is significantly more simple when findings of fact are prepared which clearly disclose the basis of the trial court's determinations. *Winter v. Winter,* 338 N.W.2d 819, 822 (N.D.1983); *Nastrom v. Nastrom, supra,* 284 N.W.2d at 581. In the instant case the trial court specifically enumerated the *Ruff-Fischer* guidelines and also set forth facts and circumstances which relate to those considerations contemplated by the guidelines. A property division will not be set aside because of the trial court's failure to show the basis for it if that basis is reasonably discernible by deduction or inference. *Winter v. Winter, supra; Nastrom v. Nastrom, supra.*

■ Important to an understanding of the basis for the trial court's property division is a proposed "stipulation and agreement" concerning property division, child custody and support prepared by Edward. Edward's trial counsel argued that the proposed agreement should be considered heavily by the trial court in reaching an equitable property division. The document was received as an exhibit at trial. The trial court's property division essentially tracks that of the proposed agreement; the major exception being the court's division of Edward's retirement annuity. Marguerite testified that under the proposed agreement she would have to work for the rest of her life and Edward would not. Her trial counsel suggested to the court what he believed would be an *equal* distribution, *i.e.*, that Marguerite would be willing to trade her share of Edward's retirement annuity for the Centennial House and $100,000 from the proceeds of a court-ordered sale of the Arlington house. During oral argument, Marguerite contended that the trial court's property division was the result of its attempt to effectuate an equal distribution of the marital estate.

The trial court's findings reveal that the court considered, in addition to those facts and circumstances already mentioned, that the parties are in relatively good health and are well educated. Edward has a bachelor's degree, a master's degree, Juris Doctor degree, and has worked toward obtaining a Ph.D. Marguerite has a bachelor's degree and master's degree in education. The court found that the parties held teaching positions in the Anchorage school system at the time they met and were married. The parties testified that they left Alaska in 1962 for the Washington, D.C., area where both secured full-time employment; Marguerite a teaching position in Arlington, Virginia, and Edward a position with the Federal government. Marguerite testified that she taught one year and then attended graduate school. She resumed teaching in the fall of 1964 but terminated her employment that same year for reasons the parties do not agree upon.

Edward entered the Peace Corps in 1967, moving Marguerite and Kristina with him to the Phillipines. They returned to the Washington, D.C., area in 1969. Edward eventually secured employment with the Bureau of Indian Affairs for which he worked ten years prior to his retirement in 1980. Marguerite testified that she also worked part time during this period.

Edward began attending law school in North Dakota in the fall of 1980. Marguerite and the children remained at the parties' home in Arlington, Virginia, until the parties mutually agreed to purchase Centennial House in July of 1981. Centennial House is a large nineteen-room home utilized as an inn as well as a personal residence. The home was purchased (1) to facilitate the parties' desire that Kristina attend a preparatory school in Northfield, (2) because it contained a den which would

provide ample space to accommodate Edward's desire to engage in the practice of law, and (3) so that Marguerite could "do something of her own" by operating an inn. The home was purchased for $110,000 with cash proceeds from the sale of North Dakota farmland owned by the parties.

The income-producing capacity of Centennial House is poor. The trial court found that Marguerite's expenses in operating the business total $1,362 per month with anticipated monthly income of only $800. Marguerite testified that she hoped that "maybe at the end of ten years it [Centennial House] will be making a third again as much as it is now."

The trial court found that Edward's monthly expenses are $2,130 including child support. The Arlington house had been renting for $700 per month subject to a $400 monthly mortgage payment. Edward's share of his retirement annuity is $932 per month. Edward testified that, although he was not sure he wanted to work, he intended to work, but that it was difficult entering the legal profession at age 55.

Marguerite projected, and the trial court found, that her monthly personal expenses are $1,138 which, when added to the expense of operating Centennial House, brings her total monthly expenses to $2,500. The trial court also found that tuition expense for Kristina comes to $5,000 per year. Marguerite's monthly income after the property division—Centennial House ($800 mo.), child support ($400 mo.), retirement annuity ($518 mo.), and part-time employment ($350 mo.)—totals $2,068 for a $432 monthly shortfall. Marguerite also testified concerning her difficulty in obtaining a full-time teaching position, not having taught for twenty years.

Marguerite testified that Edward's drinking caused her to decide to dissolve the marriage in early 1982. Edward testified that he is a "light to medium" drinker, which may have contributed to the breakdown of the marriage because Marguerite was opposed to his doing any drinking at all. He also testified that he did not want the divorce; that it was he who brought the divorce action because of the ease of which a divorce may be obtained in North Dakota as opposed to Massachusetts.

The trial court recounted the parties' testimony concerning the conduct of the parties during the marriage:

"The defendant states the plaintiff drank to excess and caused a breakdown in the marriage. The plaintiff feels that the defendant was too sensitive about drinking and he did not drink to excess.

"The defendant placed the quantity of drinking at two six-packs a night to a fifth to a pint of hard liquor or a gallon of wine.

"She stated she wanted them to move from Washington D.C. to get away from the atmosphere and hoped that the plaintiff could stop drinking.

"She related finding hidden bottles and coming to North Dakota to find the plaintiff inebriated when he picked her up at the airport.

"She did state the plaintiff was a good provider, always had a job, did a lot of house repairs, and was apparently a faithful husband.

"The plaintiff too states that the defendant was a good wife and mother."

Edward argues the trial court did not consider the fault of either party; however, in light of the above, we cannot conclude that the trial court did not consider the conduct of each party during the marriage in determining what would be an equitable property division.

Edward argues that the bulk of the parties' property was accumulated through his own efforts, and that "to divide that property 63.44% to Marguerite and 36.56% to Ed" is clearly erroneous. He also argues that it is not equitable to allow Marguerite to operate Centennial House at a loss when she could be pursuing employment at an income level consistent with her education and proven earning abilities.

Even assuming, *arguendo*, that the trial court did not consider Edward's conduct as the cause of the dissolution of the marriage, the percentages utilized in Edward's

argument fail to consider that he was awarded a substantial part (64.3%) of those benefits received under his retirement annuity. As to the equitableness of allowing Marguerite to operate Centennial House, it is sufficient to note that Edward, too, forsook employment at an income level consistent with his education and proven earning abilities by deciding to enroll in law school. He testified at trial that it would be "criminal" to ask the court to order the sale of Centennial House and the Arlington house to arrive at a more equitable division of the parties' property.

■ Edward contends that the trial court exceeded its authority under Section 14–05–24, N.D.C.C., by ordering that Marguerite's share of the retirement annuity be adjusted each October 1. He argues that any cost of living adjustments that are built into the pension benefit formula are contingent upon his continuing to stay alive, thereby constituting property he will acquire *after* the divorce.

The trial court, by considering Marguerite's contribution to the marriage during those years of Edward's Federal service and by referring to Marguerite's interest in Edward's retirement annuity as her "entitlement," appears to have awarded Marguerite a percentage of Edward's retirement annuity as a form of property division. In *Glass v. Glass*, 344 N.W.2d 677 (N.D.1984), we determined that the trial court's finding of the present value of a teacher's retirement annuity, a value less

than that agreed upon by the parties, was clearly erroneous. In resolving the matter we cited decisions of the Supreme Court of Minnesota for the proposition that they prescribe "a rule for the equitable distribution of property rights which are difficult or impossible to evaluate—ordering apportionment of the future benefits only if and when such benefits are paid. *Janssen v. Janssen*, 331 N.W.2d 752, 756 (Minn.1983); *Taylor v. Taylor*, 329 N.W.2d 795 (Minn. 1983)." [2] *Glass v. Glass, supra,* 344 N.W.2d at 678. We concluded in *Glass* as follows:

"Unless the Glasses can agree upon present values of the annuities for distribution purposes (assuming that neither side will want to waste the entire estate in appraisal battles), it may be necessary to divide one or more of the annuities pursuant to a formula that requires both to share in the ultimate benefits and risks that are involved."

Edward does not take issue with the trial court's ordering an apportionment of his retirement annuity based upon a fixed percentage of the benefits he receives. We find no merit in his argument that the cost of living adjustment ordered by the trial court constitutes a division of property acquired by Edward after the divorce. Edward's pension benefits were accumulated through and during his twenty-one years of employment with the Federal government,

**2.** In *Taylor v. Taylor, supra,* 329 N.W.2d at 798–99, the Supreme Court of Minnesota offered appropriate guidance to trial courts facing a division of retirement benefits:

"In deciding whether retirement benefits should be divided at the time of dissolution or upon future receipt by the employee spouse, the trial court should consider the advantages and disadvantages of each method in light of the facts of the particular case before it.

"Division of retirement benefits at the time of divorce has the obvious advantage of avoiding the continuing jurisdiction of the court in order to insure that the appropriate payments are made to the non-employee spouse upon receipt of pension benefits by the employee spouse. This method is preferred where there are sufficient assets available at the time of divorce to divide the present value of the retirement benefits without causing an undue

hardship to either spouse and where testimony on valuation is not unduly speculative.

"A second method requires the determination of a fixed percentage for the non-employee spouse of any future payments the employee receives under the plan, payable when paid to the employee. This method ... has the advantage of making it unnecessary to determine the present value of the pension fund. The fixed percentage method should be used where present value determinations are unacceptably speculative or there are not enough assets to equitably require that benefits due in the future be split presently. *See Holbrook v. Holbrook,* 103 Wis.2d 327, 309 N.W.2d 343 (Wis.App.1981)."

For a further discussion of these two methods of dividing retirement benefits upon dissolution see *DuBois v. DuBois,* 335 N.W.2d 503, 505 (Minn.1983).

not through his efforts in staying alive after retirement.

We have carefully reviewed the record in this case and are not left with a definite and firm conviction that a mistake has been made.

 Marguerite contends that the appeal is frivolous and requests attorney fees pursuant to Rule 38, N.D.R.App.P. An appeal is frivolous when it is flagrantly groundless. *Nissen v. City of Fargo,* 338 N.W.2d 655, 658 (N.D.1983). Marguerite has not adequately explained the basis for this contention and, therefore, her request is denied.

The judgment is affirmed in major part and remanded so that the trial court may specifically include in the award to Edward the house in Absaraka. *See* n. 1, *supra.* In all other respects, the judgment is affirmed.

VANDE WALLE, SAND, GIERKE and PEDERSON, JJ., concur.