Patricia Louise BULLOCK, Plaintiff
and Appellee,

v.

Gerald Earl BULLOCK, Defendant
and Appellant.

Civ. No. 10537.

Supreme Court of North Dakota.

Aug. 13, 1984.

Alan J. Larivee, Grand Forks, for plaintiff and appellee; argued by Thomas Dickson, Bismarck.

Kuchera, Stenehjem & Wills, Grand Forks, for defendant and appellant; argued by Karen Wills, Grand Forks, Appearance by Joyce Hagen.

ERICKSTAD, Chief Justice.

Gerald E. Bullock appeals from a judgment of the district court, Grand Forks County, granting both Gerald and Patricia L. Bullock a divorce on the ground of irreconcilable differences. Gerald contends the district court clearly erred by ordering an apportionment of his future military retirement pay as part of the property division and by awarding alimony to Patricia. We affirm.

Patricia and Gerald were married in June, 1966, and were granted a divorce in August, 1983. At the time of trial Gerald was a Lieutenant Colonel in the United States Air Force while Patricia, a homemaker for most of her married life, was unemployed. In distributing the property of the parties, the district court specifically enumerated the *Ruff-Fischer* guidelines, then made the following findings of fact:

"Virtually all the property of the parties was acquired during the marriage.

"Gerald is 40 years of age and Patricia is approximately that age too.

"Gerald has a monthly income of $3,679.02 and nets about $1,662.59 after payments are taken out for the house, land, and '82 Toyota. His direct and indirect compensation amounts to approximately $50,000 a year. Gerald has a Bachelor's Degree plus Air Force Courses.

"Patricia is not working although she does have a Bachelor's degree in education. She has taught in the past. She will have to take some more courses to teach full time. The Court will take judicial notice of the fact that declining enrollments in this area have caused a decrease in the numbers of teaching positions in this area."

Pertinent findings of the district court concerning its distribution of Gerald's military retirement pay and award of alimony to Patricia read as follows:

*"Retirement Pay*

"The Court has reviewed the *Uniform[ed] Services Former Spouses' Protection Act,* 10 U.S.C.S. § 1408.

\*      \*      \*      \*      \*      \*

"The Court finds that Patricia was a good military wife and helped significantly to further her husband's career.

"Based on this finding and the applicable law the Court shall provide that as and part of the property division the Defendant shall pay the following to the Plaintiff according to the following formula:

17 years divided by number of years Defendant puts in the military times one-half of the Defendant's retirement benefit when he retires. Such property division shall be paid in monthly installments on the same basis that the Defendant is entitled to receive his military retirement benefits. Such payments shall be paid directly to the Plaintiff and not by the Defendant. Such payments shall continue until either the Plaintiff or Defendant dies.

### *"Alimony*

"Alimony is a 'method for rehabilitating the party disadvantaged by the divorce.' *Williams v. Williams,* 302 N.W.2d 754 (1981).

"It appears that Patricia is definitely disadvantaged by the divorce. Before she was an officer's wife with a nice home to live in and never had to scrimp to make ends meet. If she needed clothes or shoes for the boys or herself she was able to go out and buy such items.

"The Court will award the Plaintiff alimony in the amount of $1,200 per month.

"Such alimony shall continue until Patricia dies. This amount shall be subject to the continued jurisdiction of this Court and may be altered based on the financial position of the parties. If she had not been a military wife and mother she could have been an established teacher.

"The Plaintiff's alimony shall cease when she starts to receive her share of the Defendant's retirement provided that her share of the retirement is at least as great as the alimony payment; or when she dies, whichever occurs first."

In addition, the district court directed that Gerald pay Patricia $17,795 for her share of a house owned by the parties in Parker, Colorado. This amount was calculated based on the court's distribution of the remainder of the marital estate:

#### *To Patricia*

| | | |
|---|---|---|
| Land in Littleton, Colorado (subject to indebtedness) | $14,530 | (net) |
| Toyota '82 automobile (subject to indebtedness) | 4,000 | (net) |
| Household property | 11,700 | |
| Tax refund | 3,430 | |
| All-Savers Certificate | 2,180 | |
| Savings Bonds | 60 | |
| | $35,900 | |
| Cash payment | 17,795 | |
| | $53,695 | |

#### *To Gerald*

| | | |
|---|---|---|
| Parker, Colorado house (subject to indebtedness) | $66,600 | (net) |
| Toyota '71 automobile | 300 | |
| Household property | 7,800 | |
| Less: Patricia's share of joint bills paid by Gerald | (3,210) | |
| | $71,490 | |
| Less: Cash payment | (17,795) | |
| | $53,695 | |

The court awarded the parties joint custody of their two children, Andrew, born August 29, 1969, and Thomas, born September 9, 1971; however, Gerald was granted physical custody of the children for a greater part of the year. Patricia was limited to "visitation" including ten weeks during summer months and one week over the Christmas holiday.

### *Military Retirement Pay*

The issue of primary importance in this case is the effect of the "Uniformed Services Former Spouses' Protection Act," Pub.L. No. 97–252, 96 Stat. 730 (1982) [codified at 10 U.S.C. § 1408 (1982)] on the United States Supreme Court's holding in *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), that fed-

eral law precludes a state court from dividing military nondisability retirement pay pursuant to state community property laws. This Court, in *Webber v. Webber*, 308 N.W.2d 548, 549 (N.D.1981), remanded for the trial court's reconsideration, in light of the *McCarty* decision, of its conclusion that the plaintiff's military retirement benefits were property rights constituting marital assets subject to distribution upon dissolution of the marriage. In *Rust v. Rust*, 321 N.W.2d 504, 507 (N.D.1982), we said that "*Webber* makes it clear that a military-retirement pension is not a divisible asset for purposes of a property division."

In *McCarty*, the Court examined the language, structure and legislative history of the applicable federal statutes and concluded "that the application of community property principles to military retired pay threatens grave harm to 'clear and substantial' federal interests." 453 U.S. at 232, 101 S.Ct. at 2741. The Court acknowledged, however, that the plight of an ex-spouse of a retired service member is often a serious one, and said:

"Congress may well decide, as it has in the Civil Service and Foreign Service contexts, that more protection should be afforded a former spouse of a retired service member. This decision, however, is for Congress alone. We very recently have re-emphasized that in no area has the Court accorded Congress greater deference than in the conduct and control of military affairs.... Thus, the conclusion that we reached in *Hisquierdo* [*v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979)] follows a *fortiori* here: Congress has weighed the matter, and '[i]t is not the province of state courts to strike a balance different from the one Congress has struck.' 439 U.S., at 590 [99 S.Ct. at 813]." *McCarty*, 453 U.S. at 235–36, 101 S.Ct. at 2743 [citation omitted].

Congress has since enacted the Uniformed Services Former Spouses' Protec-

tion Act [Act], effective February 1, 1983, pertinent provisions of which read as follows:

"(a) In this section:

(1) 'Court' means—

(A) any court of competent jurisdiction of any State, ...

\* \* \* \* \* \*

(4) 'Disposable retired or retainer pay' means the total monthly retired or retainer pay to which a member is entitled (other than the retired pay of a member retired for disability under chapter 61 of this title) less amounts which—[six "amounts" are specified.]

\* \* \* \* \* \*

(c)(1) Subject to the limitations of this section, a court may treat disposable retired or retainer pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court."

Congress' intent in enacting subsection (c)(1) was to reverse the effect of the *McCarty* decision. H.R.Conf.Rep. No. 97–749, 97th Cong., 2d Sess. 165 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 1569, 1570.

"The purpose of this provision is to place the courts in the same position that they were in on June 26, 1981, the date of the *McCarty* decision, with respect to treatment of non-disability military retired or retainer pay. The provision is intended to remove the federal pre-emption found to exist by the United States Supreme Court and permit State and other courts of competent jurisdiction to apply pertinent State or other laws in determining whether military retired or retainer pay should be divisible. Nothing in this provision requires any division; it leaves that issue up to the courts applying community property, equitable distribution or other principles of marital property

determination and distribution. This power is returned to the courts retroactive to June 26, 1981." S.Rep. No. 97-502, 97th Cong., 2d Sess. 16 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 1596, 1611.

Numerous states have recently ruled that the effect of the Act is to leave to the states the final decision concerning the divisibility of military non-disability retirement pay. *See Chase v. Chase,* 662 P.2d 944, 946 (Alaska 1983); *De Gryse v. De Gryse,* 135 Ariz. 335, 661 P.2d 185, 187 (1983); *In re Marriage of Buikema,* 139 Cal.App.3d 689, 188 Cal.Rptr. 856, 857 (1983); *Smith v. Smith,* 458 A.2d 711, 713 (Del.Fam.Ct. 1983); *Coates v. Coates,* 650 S.W.2d 307, 309–10 (Mo.App.1983); *Walentowski v. Walentowski,* 100 N.M. 484, 672 P.2d 657, 659 (1983); *Brown v. Brown,* 279 S.C. 116, 302 S.E.2d 860, 861 (1983); *Cameron v. Cameron,* 641 S.W.2d 210, 212–13 (Tex. 1982); *In re Marriage of Smith,* 100 Wash.2d 319, 669 P.2d 448, 451 (1983).

Gerald contends that the district court's division of his military retirement pay was induced by an erroneous view of the law. He argues that the Act defers to a state's own law concerning the treatment of military retirement pay, therefore, *Rust, supra,* is controlling North Dakota law until this Court changes it. Our determination in *Rust, supra,* that military retirement pay is not a divisible asset for property division purposes, was based solely on the *McCarty* decision which Congress has now effectively overruled. *Rust* can no longer be considered controlling North Dakota law with respect to the divisibility of military retirement pay.

·At the time of trial Gerald had not begun to receive military retirement pay, because he had not yet completed twenty years of active service.[1] Gerald filed answers to interrogatories in which he indicated that July 1, 1986, would be the earliest date on

which he would be entitled to receive such benefits. Although Gerald objects on appeal to the district court's division of the retirement pay, at trial he in fact expressed a desire that such a division be accomplished:

"Q. [By Ms. Wills] ... Mr. Larivee and Mrs. Bullock discussed the retired— Air Force retirement fund division for persons such as you and Mrs. Bullock who have been married for ten years or more. And you and I discussed that. What would you consider to be a fair division or percent of your Air Force retirement pay to go to Mrs. Bullock?

"A. One-half of my retired pay with the premise that she not be remarried....

"Q. And you would like the Court to so order then.

"A. Yes, I would."

Gerald later clarified his testimony by indicating that Patricia should receive only sixteen-twentieths of one-half of his retirement pay.

■ In view of Congress' intent to effectively overrule *McCarty* and Gerald's acquiescence in the district court's division of the military retirement pay as illustrated by the foregoing testimony, we cannot conclude that the district court clearly erred by dividing the retirement pay.

■ Gerald contends the district court's division clearly violates subsection (e)(1) of the Act, which reads:

"The total amount of the disposable retired or retainer pay of a member payable under subsection (d) may not exceed 50 percent of such disposable retired or retainer pay." 10 U.S.C. § 1408(e)(1) (1982).

The formula utilized by the district court in dividing the retirement pay (17 (the number of years of marriage) divided by the num-

---

**1.** The Air Force nondisability retirement system is codified at 10 U.S.C., ch. 867, § 8911 *et seq.* (1982).

ber of years Gerald serves in the military times ½ of his retirement pay) reveals that Patricia's share of the retirement pay will not exceed fifty percent of the total monthly retired or retainer pay to which Gerald may be entitled and therefore does not violate subsection (e)(1).[2]

■ During oral argument, questions arose concerning the nature of Patricia's share of the retirement pay in light of the condition placed upon the award of alimony with respect to the amount of retirement pay to which she receives. Patricia concedes that if her monthly share of the retirement pay comes to less than $1,200, then alimony payments will continue only in an amount necessary to assure her of combined retirement pay and alimony of $1,200 per month. Although the district court's use of the word *alimony* is inherently ambiguous [*Seablom v. Seablom,* 348 N.W.2d 920, 924 (N.D.1984)], it is clear that the court intended that "alimony" awarded in excess of retirement pay constitute spousal support, subject to the court's continued jurisdiction to modify its judgment upon a showing of changed circumstances. The court specifically characterized Patricia's share of the retirement pay "as and part of the property division." The provision that retirement payments to Patricia "shall continue until either the Plaintiff or the Defendant dies" may at first blush imply that such payments are in the

nature of spousal support [*see Seablom, supra*]; however, the court relied specifically on the Uniformed Services Former Spouses' Protection Act in dividing the retirement pay, which provides that such payments enforced through the Act "shall terminate ... not later than the date of the death of the [service] member or the date of the death of the spouse or former spouse to whom payments are being made, whichever occurs first." 10 U.S.C. § 1408(d)(4). It appears the court intended that Patricia's share of the retirement pay constitute a division of property and not be merely a means by which Gerald was to fulfill his obligation to pay spousal support.

Gerald contends that the district court's formula for distributing the retirement pay is clearly erroneous. He argues that the court should have used sixteen years, rather than seventeen years, as the number of years the parties were married in computing Patricia's share, because there is no evidence to support the proposition that Patricia was a "good Air Force wife and helped to further her husband's career" during the final year of the parties' marriage. He also argues that Patricia should receive only a percentage of the retirement pay that Gerald would have received as a Lieutenant Colonel had he been entitled to retire on the day of the divorce. He argues that Patricia will not contribute to any future promotions or to the years he

**2.** Subsection (d) of the Act reads in pertinent part as follows:

"(d)(1) After effective service on the Secretary concerned of a court order with respect to the payment of a portion of the retired or retainer pay of a member to the spouse or a former spouse of the member, the Secretary shall, subject to the limitations of this section, make payments to the spouse or former spouse in the amount of the disposable retired or retainer pay of the member specifically provided for in the court order...." 10 U.S.C. § 1408(d)(1).

The district court did not distribute over fifty percent of Gerald's retirement pay to her, but for sake of argument only Patricia points out that the Act does not prohibit a state court from allowing a distribution in excess of fifty percent of disposable retired or retainer pay if that part in excess is enforced by any means available

under law other than the means provided under the Act. Support for Patricia's argument is found in the Act at subsection (e)(6):

"(6) Nothing in this section shall be construed to relieve a member of liability for the payment of alimony, child support, or other payments required by a court order on the grounds that payments made out of disposable retired or retainer pay under this section have been made in the maximum amount permitted under paragraph [(e)](1).... Any such unsatisfied obligation of a member may be enforced by any means available under law other than the means provided under this section in any case in which the maximum amount permitted under paragraph (1) has been paid...." 10 U.S.C. § 1408(e)(6).

will spend in military service after the divorce.

An analogous argument was made in *Keig v. Keig,* 270 N.W.2d 558 (N.D.1978), a case in which we held that the trial court was correct in considering a private profit-sharing fund in the division of property. The appellant argued that his former spouse contributed nothing to the existence of the profit-sharing fund; however, he agreed that she contributed much to his medical practice by working as a secretary-nurse during the early years of the marriage. We said:

> "Even though Gladys Keig did not actively contribute to the accumulation of the pension fund, there is no question but that it was accumulated while the marriage status existed.... Gladys may not have contributed to accumulation of the pension fund per se, but the record indicates that she provided employment, effort and support towards establishing the medical practice. In making a division of the property, the marriage status and obligations arising therefrom, as a whole, must be considered. Contribution made by a spouse during the early years of a marriage is an important factor to be considered by the district judge in a division of the property." 270 N.W.2d at 560.

The district court's formula for distributing the retirement pay recognizes the important role a military spouse plays in contributing to the service member's career. It is the contributions and sacrifices made by military spouses which in part prompted Congress to enact the Uniformed Services Former Spouses' Protection Act.[3] The district court's finding that Patricia helped significantly to further Gerald's career is supported by substantial evidence. The record indicates that Patricia was primarily responsible for providing care for the children and managing the household through frequent change-of-station moves and separations unique to life in the military. She also provided economic support by working outside the home at various times during the marriage.

What is an equitable distribution of marital property is generally a matter for the trial court's discretion and depends on the facts and circumstances in each case. *Lentz v. Lentz,* 353 N.W.2d 742, 743 (N.D.1984). Certainly in this case Gerald's years of military service during the parties' marriage provided a basis for any future promotions and increases in pay for length of service to which he may become entitled. Gerald's military career and earning ability were developed and enhanced throughout the course of the parties' seventeen years of marriage. We therefore believe that the formula utilized by the district court adequately determines the actual proportion of potential retirement pay derived as a result of the marriage. In the case of the military, resigna-

---

**3.** "The [C]ommittee [on Armed Services] received extensive testimony from the uniformed services and public witnesses on the contributions and sacrifices made by the military spouse throughout the service member's career. A recurrent recruiting point that is made to a military couple from the time of the spouse's initial entry into the military is that the spouse is a partner in the member's career. The theme of the 'military family' and its importance to military life is widespread and well publicized. Military spouses are still expected to fulfill an important role in the social life and welfare of the military community. Child care and management of the family household are many times solely the spouse's responsibility. The military spouse lends a cohesiveness to the family facing the rigors of military life, including protracted and stressful separations. The committee finds that frequent change-of-station moves and the special pressures placed on the military spouse as a homemaker make it extremely difficult to pursue a career affording economic security, job skills and pension protection. Therefore, the committee believes that the unique status of the military spouse and that spouse's great contribution to our defense require that the status of the military spouse be acknowledged, supported and protected." S.Rep. No. 97–502, 97th Cong., 2d Sess. 6 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 1596, 1601.

tion, discharge, death and other factors may occur before the service member is eligible to receive retirement pay. The formula considers this by allocating equally between the parties the risk that Gerald may never receive military retirement pay. *See Glass v. Glass*, 344 N.W.2d 677 (N.D. 1984).

### Alimony

Gerald contends that the district court's award of alimony, or as we have characterized it—spousal support, to Patricia is clearly erroneous. He argues that the award is an application of the traditional theory of alimony as a continuation of the right of one spouse to be supported by the other during marriage—a theory we have explicitly rejected. *See Carr v. Carr*, 300 N.W.2d 40, 46 (N.D.1980). He suggests that alimony should only continue for a period of three years.

■ We have recently said that "[s]pousal support may be for a definite period of time to aid a disadvantaged party in acquiring new skills [*see, e.g., Smith v. Smith*, 326 N.W.2d 697, 700 (N.D.1982) ] or it may be permanent to provide maintenance for a party incapable of rehabilitation. [*see, e.g., Briese v. Briese*, 325 N.W.2d 245, 248–49 (N.D.1982); *Gooselaw v. Gooselaw*, 320 N.W.2d 490, 493 (N.D. 1982) ]." *Seablom, supra.* Section 14–05–24, N.D.C.C., authorizes the trial court "to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively." The determination of a just award lies within the discretion of the trial court and depends upon the facts and circumstances of each case. *Briese, supra,* 325 N.W.2d at 249. We treat a trial court's determination concerning alimony as a finding of fact which will not be set aside on appeal unless clearly erroneous. *E.g., Jondahl v. Jondahl*, 344 N.W.2d 63, 67 (N.D.1984). A finding is clearly errone-

ous when we are left with a firm and definite conviction that a mistake has been made. Simply because we might have viewed the evidence differently, had it been presented to us initially as the trier of fact, does not entitle us to reverse the trial court. *E.g., Mees v. Mees*, 325 N.W.2d 207, 209 (N.D.1982).

Patricia testified concerning her work experience during the parties' marriage. She was a school teacher in Great Falls, Montana, from 1966 to 1969, and a school teacher in San Antonio, Texas, from approximately 1973 to 1977. She also was employed as a consultant for a bank in Parker, Colorado, for 1½ years. After moving to Grand Forks, Patricia worked in the air base flower shop for one year until February, 1983.

■ Patricia testified that she would have to return to school to obtain an active teaching certificate. The district court took judicial notice of the limited job market for teachers in the area. The court also found that had Patricia not been a military spouse, "she could have been an *established* teacher." Based upon the record before us, and in view of the contingency placed upon the award of alimony with respect to retirement pay which Patricia may receive in future years, we cannot conclude that the district court's findings concerning alimony are clearly erroneous. The court could very reasonably have concluded that rehabilitation beyond Patricia's present earning capacity was not likely in the near future. In the meantime, the disparity in the earning abilities of the parties justifies the award of alimony. *See Nastrom v. Nastrom*, 284 N.W.2d 576, 581–82 (N.D.1979).

The alimony award is in the nature of spousal support and therefore is subject to modification upon a showing of a change in circumstances justifying such a modification. *Mees, supra.* In this light, we are not left with a firm and definite conviction that a mistake has been made.

912

■■■

■ We do not find the appeal frivolous. We therefore deny Patricia's request for double costs and reasonable attorney fees pursuant to Rule 38, N.D.R.App.P.

The judgment is affirmed.

VANDE WALLE, PEDERSON, GIERKE and SAND, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the opinion authored for the court by the Chief Justice. I write separately because of my concern for what may happen in the future concerning the "alimony" ordered to be paid in this case. I recognize that we cannot determine now what the future will be. I also recognize, however, that parties read the opinions of the trial courts as well as the opinions of this court and from them derive what they believe will be the holding in any future litigation that might occur.

This court has, in the past few years, indicated rather strongly that alimony, or spousal support, as we prefer to call it, should when possible be used for rehabilitative purposes. *Smith v. Smith*, 326 N.W.2d 697 (N.D.1982). If rehabilitation is not possible alimony may become permanent to provide maintenance for the disadvantaged party. *Briese v. Briese*, 325 N.W.2d 245 (N.D.1982). The majority opinion recognizes these principles. In this instance Patricia is apparently unable to secure employment which would provide her with any substantial income at the present time. However, considering her age (apparently 38 at the time of trial) and her education and previous employment experience, attaining new skills should not be that difficult. My concern here is that the decree of the trial court may lull Patricia into concluding she is not obligated to make an effort toward rehabilitation but rather is entitled to alimony for maintenance purposes for the rest of her life because if her share of Gerald's retirement does not reach $1,200 per month she will be entitled to the difference from Gerald. The trial court indicated that the amount of alimony was subject to the continuing jurisdiction of the trial court and may be altered. That is, of course, the law. However, I urge the trial courts to issue decrees that encourage—not force—the disadvantaged party to seek rehabilitation such as was done in *Smith, supra.* I firmly believe that a party who is rehabilitated and does away with the need for alimony, and thus severs the dependency on the other party, will, in the course of events, be a much happier person and productive member of society.