[No. 12005-4-II. Division Two. June 18, 1990.]

*In the Matter of the Marriage of* JOSEPH BOCANEGRA, *Appellant, and* ANITA BOCANEGRA, *Respondent.*

---

*Herbert Gelman* and *Gelman & Associates,* for appellant.

*Charles W. Talbot* and *Talbot, Orlandini, Waldron & Hemmen, P.S.,* for respondent.

THOMPSON, J.*—Joseph Bocanegra appeals a judgment ordering him to pay his former wife, Anita Bocanegra, all the cost–of–living increases in his military pension, and attorney fees in this action. Mrs. Bocanegra cross–appeals the court's calculation of the amount due, and its denial of interest on that amount. She also seeks attorney fees on appeal. We affirm in part, reverse in part, and remand for additional factual determinations.

The Bocanegras were married in 1959. The marriage was dissolved in 1979. They had seven children, five of whom were living at home in 1979.

Mrs. Bocanegra did not appear at the dissolution hearing on May 17, 1979. She was represented by her court–appointed guardian ad litem, who also acted as her attorney. The court found Mrs. Bocanegra was unemployable, "based mainly on a mental incapacity due in part to her failure to take necessary medication".

Mr. Bocanegra had been in the military from 1952 to 1972. In 1979, he was receiving $1,000 per month military

---

*This appeal was heard by a panel of Division Three judges sitting in Division Two.

retirement pay. In addition to the military pension, the couple had accumulated community property valued at approximately $68,000, including the family home, three vehicles, a boat, stock, 40 acres of real estate in Spokane County, and a real estate contract on property on Lake Coeur d'Alene, Idaho. The decree granted custody of the children to Mr. Bocanegra. It also awarded him all of the community property, except:

> that [Mr. Bocanegra] . . . is hereby required to pay to [Mrs. Bocanegra] Five Hundred Dollars ($500.00) per month for the remainder of her life as her one–half (1/2) interest in the parties' community property as set forth above. In addition to that, *[Mrs. Bocanegra] shall be awarded the cost of living increases in [Mr. Bocanegra's] military retirement, after deduction of federal taxes thereon.* In addition to that, [Mr. Bocanegra] shall be required to make [Mrs. Bocanegra] the irrevocable primary beneficiary on his two (2) term life insurance policies which have a total face value of $12,500.00 with the Air Force Association and $24,000.00 with the Armed Services Mutual Benefit Association. Said insurance would have the purpose of compensating [Mrs. Bocanegra] for her share in the parties' community property in the event of [Mr. Bocanegra's] death. In addition, [Mr. Bocanegra] should be required to provide medical insurance for [Mrs. Bocanegra] with Pierce County Medical or a like company, the premiums of said medical insurance being alimony.

(Italics ours.) It is undisputed that the $500 monthly payment to which the decree referred was one–half of Mr. Bocanegra's net monthly retirement pay.

After the decree was entered, Mr. Bocanegra began making the $500 payments, and increased the amount to $550 in 1980. Mrs. Bocanegra initiated this action in December 1987, alleging, among other things, that Mr. Bocanegra had failed to pay her the cost–of–living increases in his military retirement pay. In response, Mr. Bocanegra argued federal law limited the payment to no more than 50 percent of his retirement pay, and the decree thus should be limited to providing only 50 percent of the cost–of–living increases. On March 18, 1988, a Pierce County Superior Court Commissioner held Mrs. Bocanegra was entitled to only half of the cost–of–living increases.

In May 1988, the Superior Court revised the Commissioner's order, holding the 1979 decree unambiguously required Mr. Bocanegra to pay all cost–of–living increases since 1979 to Mrs. Bocanegra. In March 1989, the court entered judgment against Mr. Bocanegra for arrearages in the amount of $1,687.90. The court did not allow interest on the arrearages, and denied attorney fees "at this time". On Mrs. Bocanegra's motion for reconsideration, the court awarded her $4,000 in attorney fees.

■ We first consider whether Mrs. Bocanegra is entitled to all of the cost–of–living increases in Mr. Bocanegra's military retirement pay. Mr. Bocanegra argues the 1979 dissolution decree did not intend to award Mrs. Bocanegra the full amount of the cost–of–living increases in his retirement pay. Interpretation of a decree is a question of law. *In re Marriage of Gimlett*, 95 Wn.2d 699, 705, 629 P.2d 450 (1981). If a decree is clear and unambiguous, there is nothing for the court to interpret. *Byrne v. Ackerlund*, 108 Wn.2d 445, 453, 739 P.2d 1138 (1987). The 1979 decree unambiguously requires Mr. Bocanegra to pay all of the cost–of–living increases to Mrs. Bocanegra.

Even if we were to view the decree's language as ambiguous, we would be required to determine the court's intent in entering the original decree. *Berry v. Berry*, 50 Wn.2d 158, 161, 310 P.2d 223 (1957). The court's findings and conclusions entered when the original dissolution was granted contain language identical to that in the decree, and therefore are not helpful in determining intent. However, the court expressed concern during the hearing as to the adequacy of the property distribution:

THE COURT: You see, the thing I'm concerned about once this thing is final, this woman is going to go to somebody and she's going to claim she was not properly represented and that she didn't get a fair shake in the property and somebody is going to appoint a guardian ad litem and you are apt to have a great big lawsuit, and that's what I have to look at in the future.

Despite the court's concerns, it approved the property distribution, at least in part on the basis Mr. Bocanegra was

willing to forgo cost–of–living increases in his retirement pay:

Q. You are receiving retirement from the military in the approximate amount of $1,000 a month.
A. Yes.
Q. And you are also willing that any cost of living increase that you receive in that amount of retirement after the taxes are taken out would go to her.
A. Yes.

 THE COURT: Excuse me. She's to get his net retirement?
 MR. HOLUM [counsel for Mr. Bocanegra]: No, she's to get the net cost of living increases from year to year. We are going to make a proposal as far as money to go to her every month, but we feel that there is a need to increase that on a yearly basis because of inflation.

Later, in his argument to the court, Mr. Bocanegra's attorney suggested that Mrs. Bocanegra would receive a specific amount "plus whatever increase that he receives in his retirement". At no time during the hearing did anyone, including Mr. Bocanegra or his attorney, indicate Mrs. Bocanegra would receive only half (or any other fraction) of the cost–of–living increases.

Mr. Bocanegra now contends this interpretation of the decree would result in a "grossly unequal" award to Mrs. Bocanegra. *In re Marriage of Pea*, 17 Wn. App. 728, 731, 566 P.2d 212 (1977). Mr. Bocanegra complains Mrs. Bocanegra would receive almost 60 percent of "his retirement", without recognizing that the bulk of the pension is not *his* separate, but *community* property. Mrs. Bocanegra did not receive any of the other community property valued at approximately $68,000. Forty–six years old and unemployable, she received only medical insurance as spousal maintenance. Mr. Bocanegra was given custody of the parties' five children,[1] but at the time he was earning $1,400 per month, in addition to his military retirement pay. The court's requirement that he pay his former wife of 20 years

---

[1] At the time of the dissolution in June 1979, the five children living with Mr. Bocanegra were: Frank (age 18), Robert (age 17), Linda (age 15), Joanne (age 11), and Carla (age 10).

the pension cost–of–living increases is hardly comparable to the "patent disparity" in *Pea*,[2] at 731.

Mr. Bocanegra next contends the Uniformed Services Former Spouses' Protection Act (USFSPA), 10 U.S.C. § 1408(e)(1), limits the court's authority to award military retirement pay to 50 percent of the disposable pay. Congress enacted the USFSPA in response to *McCarty v. McCarty*, 453 U.S. 210, 232–33, 69 L. Ed. 2d 589, 101 S. Ct. 2728, 2741 (1981), in which the Supreme Court held federal law preempted states' domestic relations laws and prohibited the division of military retirement pay as community property in a dissolution.

■ The USFSPA has essentially two purposes: First, it authorizes state courts to treat "disposable retired or retainer pay" as community property. 10 U.S.C. § 1408-(c)(1); *see In re Marriage of MacDonald*, 104 Wn.2d 745, 748, 709 P.2d 1196 (1985). Second, it

> creates a payments mechanism under which the Federal Government will make direct payments to a former spouse who presents, to the Secretary of the relevant military service, a state–court order granting her a portion of the military retiree's disposable retired or retainer pay.

*Mansell v. Mansell*, 490 U.S. 581, 104 L. Ed. 2d 675, 109 S. Ct. 2023, 2026 (1989). The act contains two limitations on this "payments mechanism": (1) to receive direct payments, a former spouse must have been married to the military member "for a period of 10 years or more during which the member performed at least 10 years of service creditable in determining the member's eligibility for retired or retainer pay . . .", 10 U.S.C. § 1408(d)(2); and (2) direct payments

---

[2] In *Pea,* the wife, with a limited education and difficulty reading and speaking English had extremely limited employment potential. After 13 years of marriage, the parties had accumulated assets of $8,500. The husband was expected to qualify for a military pension in 2 years 10 months. At that time, he could choose to continue his military employment, earning more than four times what his former wife could earn, or he could retire into an employable trade and in addition receive his military pension of at least $362.25 monthly. The trial court concluded that half of the sum of $8,500 would offset the wife's rights in the pension. The Court of Appeals reversed, calling the award "grossly unequal". *Pea,* at 731.

may not exceed 50 percent of the retiree's disposable retirement pay. 10 U.S.C. § 1408(e)(1);[3] *see Mansell,* 109 S. Ct. at 2026.

The Washington Supreme Court implicitly recognized the dual purposes of the USFSPA in *In re Marriage of Konzen,* 103 Wn.2d 470, 693 P.2d 97, *cert. denied,* 473 U.S. 906, 87 L. Ed. 2d 654, 105 S. Ct. 3530 (1985). There, the court held the 10–year requirement applied only to decrees requiring direct payments to the former spouse, not to all property divisions. *Konzen,* at 474–77. Other provisions indicate the 50 percent limit similarly applies only to the "payments mechanism" portion of the statute. For example, section 1408(e)(6) provides:

> Nothing in this section shall be construed to relieve a member of liability for . . . payments required by a court order on the grounds that payments made out of disposable retired or retainer pay under this section have been made in the maximum amount permitted . . .. Any such unsatisfied obligation of a member may be enforced by any means available under law other than the means provided under this section . . ..

Also, section 1408(e)(5) provides that an order providing for payment of more than 50 percent of the disposable retirement pay

> shall not be considered to be irregular on its face solely for that reason. However, such order shall be considered to be fully satisfied for purposes of this section by the payment to the spouse or former spouse of [50 percent of the disposable retirement pay].

This provision envisions decrees that may provide for direct payment of more than 50 percent of the disposable retired pay.

Mr. Bocanegra relies on the following language from *In re Marriage of Smith,* 100 Wn.2d 319, 323, 669 P.2d 448 (1983):

> [The USFSPA] permits a court to award up to 50 percent of the disposable retired or retainer pay to the nonmilitary

---

[3]The subsection provides: "The total amount of the disposable retired or retainer pay of a member payable under subsection (d) may not exceed 50 percent of such disposable retired or retainer pay."

spouse, provided the couple was married for at least 10 years during qualified service.

*Konzen,* at 474, 476, treated this language as dictum, on the basis the 10–year requirement clearly was not at issue. Similarly, the language in *Smith,* regarding the 50 percent limit, is dictum because the former spouse was awarded only 36 percent of the retirement payments. *Smith,* at 321. Moreover, the language quoted above may be interpreted as referring only to an award ordering direct payment by the military to the former spouse.

We have found only one case from other jurisdictions[4] that squarely addresses this issue. In *Deliduka v. Deliduka,* 347 N.W.2d 52, 55 (Minn. Ct. App. 1984),[5] the court observed:

> A fair reading [of the USFSPA] shows that the act grants states the authority to treat *all* disposable retired pay as marital property, but limits *direct government payments* to former spouses to 50 percent of disposable retired pay . . .. That means that a state court wishing to award a former spouse more than 50 percent of disposable retired pay must order direct government payments *and* payments by the member of the military to the spouse.

---

[4]In *Bullock v. Bullock,* 354 N.W.2d 904, 908–09 (N.D. 1984), the court did apply the 50 percent limit, but only because the decree had ordered direct payments from the military. In a footnote, the court recognized the limit would not apply if payments were to be made in another way. *Bullock,* 354 N.W.2d at 909 n.2. Several cases address the related issue whether a state court is limited to consideration of "disposable" retirement pay, or may treat the *gross* retirement pay as marital property, an issue that has been decided in *Mansell v. Mansell, supra,* and is not raised here. *See Beesley v. Beesley,* 114 Idaho 536, 758 P.2d 695, 698–99 (1988); *Grier v. Grier,* 731 S.W.2d 931 (Tex. 1987) (subsequently cited for the proposition that the 50 percent limit is not applicable where payments are to be made by the former spouse, instead of the military, *Cain v. Cain,* 746 S.W.2d 861, 863 (Tex. Civ. App. 1988)); *White v. White,* 105 N.M. 600, 734 P.2d 1283, 1285–87 (Ct. App. 1987); *Casas v. Thompson,* 42 Cal. 3d 131, 720 P.2d 921, 928–33, 228 Cal. Rptr. 33, *cert. denied,* 479 U.S. 1012, 93 L. Ed. 2d 713, 107 S. Ct. 659 (1986).

[5]Mr. Bocanegra argues Mrs. Bocanegra has cited no cases in which a court has awarded more than 50 percent of the disposable retirement pay. In *Deliduka,* 347 N.W.2d at 55, the court ordered the former husband to pay 50 percent of *gross* benefits, which obviously would be more than 50 percent of the disposable pay.

(Footnotes omitted.) Under this reasoning, a court may require the entire award to be paid in direct payments from the former spouse, as here, avoiding altogether the "payments mechanism" of the USFSPA.

We agree that the court may award more than 50 percent of a former spouse's disposable military retirement pay. The USFSPA provision limiting payment to 50 percent of the disposable pay relates only to the "payments mechanism" portion of the statute, under which a court may require direct payment from the military to the retiree's former spouse. In this case, the decree does not require such direct payments, and the USFSPA thus has no direct application.

■ On cross appeal, Mrs. Bocanegra contends the court erred in calculating the arrearages. The trial court's judgment of $1,687.90 is the sum of $6,187.90, reduced by $1,000 (which Mr. Bocanegra claims he paid to Mrs. Bocanegra for a trip to Germany), and by $4,500 (apparently the amount Mr. Bocanegra paid above the monthly $500 required by the decree). We are not able to duplicate the court's figures so as to determine their accuracy and are not sure how it calculated the arrearages. The record does not include findings to support the judgment. We thus remand for entry of appropriate findings.

Two things are apparent from the judgment: (1) the court believed it was necessary to calculate and apply a specific tax rate to the cost–of–living increases; and (2) the court believed the decree awarded Mrs. Bocanegra a flat $500 per month, with increases to be added to that base figure.[6]

■ The tax problem results from the phrase in the decree: "after deduction of federal taxes thereon". Mr.

---

[6]This is apparent from the judgment's compensation for the $50 per month Mr. Bocanegra had been paying above the base $500 amount.

Bocanegra argues this requires the court first to determine his *actual* tax rate for each year (apparently based on his actual taxable income and his actual tax liability), then apply this rate to any cost–of–living increase in his retirement pay. The original decree did not mention any such complicated formula. The original court's findings, in fact, indicate the court intended its award to be based on Mr. Bocanegra's *net* pay, from which taxes already have been withheld:

> The retirement is increased periodically to reflect the increase in the cost of living. Said retirement is subject to taxation by the U.S. Government, and the increases that are received by [Mr. Bocanegra] are reduced by the fact of their being taxed.

We thus interpret the original decree to mean simply that Mrs. Bocanegra is to receive all of the cost–of–living increases, as they are reflected in Mr. Bocanegra's net monthly pay.[7] Mr. Bocanegra argues that the amounts withheld from his retirement pay are not based on his *actual* tax rate. However, this is a problem entirely within his power to resolve. We therefore believe the court erred in applying a separate tax rate to the cost–of–living increases.

As for the remaining calculation, we agree with Mrs. Bocanegra that the decree clearly intended to award each party $500 per month from the net retirement pay, with the remainder to go to her as cost–of–living increases. The result is that Mr. Bocanegra should have retained $6,000 per year, and Mrs. Bocanegra should have received the remainder. This conclusion is based on the clear language of the decree, which does not support the complicated, confusing formula proposed by Mr. Bocanegra.

 Mrs. Bocanegra also contends the court erred in denying interest on the arrearages owed. Interest is properly awarded if a claim is liquidated, *i.e.,* "where evidence

---

[7]This interpretation of the decree also is consistent with *Mansell v. Mansell, supra,* in which the Supreme Court held the USFSPA gives states the authority to treat only *disposable,* not gross, retirement pay as property divisible on divorce.

furnishes data which makes it possible to compute the amount with exactness, without reliance on opinion or discretion". *Sime Constr. Co. v. WPPSS,* 28 Wn. App. 10, 18, 621 P.2d 1299 (1980), *review denied,* 95 Wn.2d 1012 (1981). In the course of this case, the decree has been interpreted variously in both parties' favor. It has been impossible to calculate the arrearages without reliance on an interpretation of the decree's provisions. The amount thus is unliquidated. We affirm the court's denial of interest.

Finally, we consider the court's award of attorney fees to Mrs. Bocanegra. RCW 26.09.140 provides for an award of reasonable attorney fees for "maintaining or defending any proceeding under [RCW 26.09] . . .". Clearly this is such a proceeding. However, fees may be awarded under this provision only after the requesting party's needs are balanced against the other party's ability to pay. *In re Marriage of Campbell,* 37 Wn. App. 840, 846, 683 P.2d 604 (1984).

The record in this case supports the trial court's award. However, our decision here will result in a substantial award to Mrs. Bocanegra, with opposite financial consequences for Mr. Bocanegra. On remand, therefore, the court must reconsider its attorney fee award in light of this decision. *See Ovens v. Ovens,* 61 Wn.2d 6, 11, 376 P.2d 839 (1962) (court evaluated former spouse's need in light of amount of underlying judgment); *see also In re Marriage of Mason,* 40 Wn. App. 450, 458, 698 P.2d 1104 (court vacated attorney fee award on basis of changes in parties' financial circumstances after entry of award), *review denied,* 104 Wn.2d 1017 (1985). Likewise, attorney fees on appeal shall abide the court's determination on remand.

We affirm the court's determination that Mrs. Bocanegra is entitled to all of the cost–of–living increases in her former husband's military pension. However, we remand for recalculation of the arrearages in light of the principles addressed herein, and for reconsideration of the attorney

fee award. We affirm the court's denial of interest on the arrearages.

MUNSON and SHIELDS, JJ., concur.

Review denied at 116 Wn.2d 1008 (1991).